UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YARLEN HENRY,
WADE GARBIE,
DAWN WORTHAM,
and KRISTAL SCOTT,

      Plaintiffs,                                      Civil Action No.:

v

CITY OF DETROIT, and
DETROIT POLICE OFFICERS
ASSOCIATION,

      Defendants.

_____

JAMES B. RASOR  (P 43476)
ANDREW J. LAURILA  (P 78880)
Rasor Law Firm, PLLC
Attorneys for Plaintiffs
201 E. Fourth Street
Royal Oak, MI  48067
248/543-9000 // 248/543-9050 fax
ajl@rasorlawfirm.com
_____

## **<u>PLAINTIFFS' COMPLAINT & JURY DEMAND</u>**

NOW COMES PLAINTIFFS, YARLEN HENRY, WADE GARBIE, DAWN WORTHAM and KRISTAL SCOTT, by and through their attorneys, Rasor Law Firm, PLLC, and for their Complaint and Jury and Demand against Defendants CITY OF DETROIT and the DETROIT POLICE OFFICERS ASSOCIATION states as follows:

## GENERAL ALLEGATIONS

### Parties

1.      At all relevant times, Plaintiff Yarlen Henry was a resident of the City of Detroit, County of Wayne, State of Michigan.

2.      At all relevant times, Plaintiff Wade Garbie was a resident of the City of Warren, County of Macomb, State of Michigan.

3.      At all relevant times, Plaintiff Dawn Wortham was a resident of the City of Oak Park, County of Oakland, State of Michigan.

4.      At all relevant times, Plaintiff Kristal Scott was a resident of the City of Redford, County of Wayne, State of Michigan.

5.      At all relevant times, Defendant City of Detroit is a Michigan municipal corporation, duly organized and carrying on governmental functions, in City of Detroit, County of Wayne, State of Michigan, and is the body responsible for the control and oversight of its departments, agencies and facilities including the Detroit Police Department.

6.      At all relevant times, Defendant Detroit Police Officers Association ("DPOA") is a labor organization and is a covered entity under the ADA pursuant to 42 U.S.C. § 12111(2)

7.      This lawsuit arises out of events occurring within the City of Detroit, County of Wayne, and State of Michigan.

8.     Plaintiffs were part of a mass decision by Defendant City of Detroit, in part based on discriminatory collective bargaining agreement terms negotiated by Defendant DPOA, to eliminate officers' positions with the DPD who suffered from disabilities.

9.     Because Plaintiffs were part of a concurrent class of employees forcibly retired around the same time based on the same discriminatory decision-making, these matters are properly joined pursuant to Fed. R. Civ. P. 20(a)(1) as all the Plaintiffs' claims arise out of the same unlawful conduct by Defendants and the same decision-makers' discriminatory forced-retirement.

10.    Defendants' disability discrimination in violation of the ADA involves common questions of law and fact pursuant to Fed. R. Civ. P. 20(a)(1)(B).

## Jurisdiction and Venue

11.    This cause of action involves violations of Plaintiffs' civil rights, as secured by the United States Constitutions, and is brought pursuant to the Americans with Disabilities Act.

12.    This Court has jurisdiction over the claims arising under federal law pursuant to 28 USC §§ 1331, 1343.

13.    The amount in controversy exceeds $75,000.00 exclusive of costs, interest, and attorney fees, and jurisdiction is otherwise proper in this Court.

14.    Venue is appropriate in this Court pursuant to 28 USC §1391(b), as this cause of action arises out of occurrences that took place within this District in the

County of Oakland and Defendant transacts and conducts business within this District.

15.     Plaintiffs all timely filed charges with the EEOC regarding these ADA violations and received right to sue letters as following: Kristal Scott's right to sue for charge number 471-2018-00763 was received on September 2, 2021 and the other Plaintiffs' collective charge(s) were issued right to sue letters on September 8, 2021.

16.     Despite that the EEOC had found cause and transferred Plaintiffs' EEOC charges to the Department of Justice for ongoing investigations, because the investigation took years, Plaintiffs requested their right to sue letters in 2021.

17.     Plaintiffs have exhausted all necessary administrative requirements to pursue these ADA claims.

## COMMON FACTUAL ALLEGATIONS

18.     Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs one through 17 of the General Allegations, as if fully set forth herein, paragraph by paragraph, word for word.

19.     Beginning on or around the time of Detroit's bankruptcy in 2014, Detroit Mayor Michael Duggan set out to cut costs in any way the City could find.

20.     In light of this overarching decision by Duggan, he enlisted DPD Police Chief James Craig to likewise find ways to cut costs in his department; the DPD maintains one of the largest budgets within the City of Detroit.

21.     Craig determined that it would be cheaper to forcibly retire officers who had been deemed "permanently disabled," despite whether they could perform the functions of either a police officer or of the assignment they were performing at that time.

22.     In lieu of Duggan's instruction, Chief Craig issued a mandate that the DPD should hire as many full duty officers as possible.

23.     Implicit in this "mandate" was that the DPD would forcibly retire as many disabled officers as possible under the guise of the Collective Bargaining Agreement.

24.     Based on this mandate from James Craig and language in the CBA, the DPD began forcibly retiring disabled officers.

25.     Specifically, the City relied on Section 34(E) of the parties CBA, which states that, "[n]othing in this Article shall affect the right of the Department under the Charter of the City of Detroit to refer employees for duty or non-duty disability pensions."

26.     Plaintiffs were included among the many disabled officers that were set to be forcibly retired discriminatorily.

27.     Before determining to retire various disabled officers, including but not limited to Plaintiffs, Defendants undertook no decision-making as to these known disabled officers' jobs, the officers' specific disabilities, or ability to perform

functions of their positions or the extent of their perceived inability to perform certain essential functions.

28.     The crux of Defendants' decision here arose out of either a discriminatory animus or a patent misunderstanding of the ADA: i.e. the City of Detroit does not have to accommodate any individual who suffered a "permanent disability."

29.     Despite Defendants' discriminatory conduct, there are still unaccounted-for permanently disabled officers working for the DPD.

30.     Further, the DPD does not require non-disabled officers to pass a 24-function test for a police officer, even though Defendant employs numerous, non-disabled officers who cannot perform all 24 functions that Defendant requires disabled officers to do in order to avoid forced retirement.

31.     Likewise, Chief Craig admitted that this ultimate decision to forcibly retire these individuals arose out of his desire to eliminate restricted duty positions (and the disabled officers) and replace those disabled officers with allegedly cheaper civilians.

32.     Chief Craig has admitted that although his purported basis for forcibly retiring these disabled officers was because it is less expensive, there was no financial reason the DPD could not have maintained the disabled officers and hire new officers.

33.     The civilians that Defendant replaced the disabled officers with were less qualified than the retired officers/employees, and upon information and belief, appeared to be cheaper for Defendant to employ.

34.     Likewise, the civilians that Defendant replaced the disabled officers with could not perform any functions of the retired individuals as they were not sworn police officers.

35.     Every officer who was on restricted duty and/or deemed "permanently disabled," including Plaintiffs, had been put there as a reasonable accommodation for a disability and/or needed an accommodation.

36.     Plaintiffs' monthly income pursuant to a pension—both duty and non-duty—is significantly lower than income earned as a police officer and the forcible retirement imputed various limitations on earning capacity that would not have been present had Plaintiffs' not been discriminatorily forced to retire.

37.     Defendants' decision to retire individuals who had requested the reasonable accommodation of restricted duty and/or continued employment only to hire non-disabled, purportedly less expensive civilians to replace them is a violation of the ADA.

## **Plaintiff Yarlen Henry Facts**

38.     Plaintiff was a longtime employee of Defendant City of Detroit as a police officer, where she began working on 2008.

39.     In 2011, Plaintiff Henry suffered an on-duty injury that impaired her right shoulder and collar bone.

40.     On or around February 5, 2013, due to her injuries, Defendant placed her on a restrictive duty assignment where she was assigned to Defendant's records/identification unit.

41.     Plaintiff's assignment in the records unit was deemed an accommodation.

42.     Her restrictions included no patrol duty and no lifting greater than 20 pounds, and her shoulder and collar bone impairment impacted her sleeping, lifting, working, and performing manual tasks.

43.     After being recommended for a forced retirement based on her disability, Plaintiff was forcibly retired on or around September 17, 2017.

44.     Defendant ultimately replaced Plaintiff with a civilian, who could not perform any of the police functions that Plaintiff could.

45.     Likewise, Plaintiff was not offered to work in this position as a civilian.

46.     At no point did Defendant receive any notice that permitted a finding that she could not perform her assignment in the records unit; in other words, Plaintiff could perform the position with or without a reasonable accommodation.

47.     Despite that Plaintiff had performed her job in the Records/ID unit admirably and without issue for numerous years, she was forcibly retired.

**Plaintiff Wade Garbie Facts**

48.    Plaintiff was a longstanding officer employed with the DPD.

49.    In 2010, Plaintiff suffered an on-duty left knee injury while chasing a suspect, and this was the same knee that he had previously injured in 2006.

50.    In 2011, Plaintiff was assigned a restricted duty assignment in the identification unit, which accommodated Plaintiff's disability.

51.    Plaintiff's knee injury impacted the substantial major life activities of performing manual tasks, walking, standing, lifting, bending, and working.

52.    On or around March 26, 2017, Plaintiff was forcibly retired from his position based on his disability.

53.    Defendant ultimately replaced Plaintiff with a civilian, who could not perform any of the police functions that Plaintiff could.

54.    Plaintiff's job in the ID unit entailed accessing criminal records and criminal history, and submitting documents to the State of Michigan, which required a police certificate; a civilian could not perform those functions.

55.    At no point did Defendant receive any notice that permitted a finding that Plaintiff could not perform his assignment in the records unit; in other words, Plaintiff could perform his job with or without an accommodation.

56.    Despite that Plaintiff had performed his job in the ID unit admirably and without issue for numerous years, he was forcibly retired.

**Plaintiff Dawn Wortham Facts**

57.    Plaintiff Wortham had been a longtime employee of the DPD.

58.     Following an accident that seriously injured Plaintiff's back, Defendant placed her on restricted duty in 2009

59.     Plaintiff's back injury impacted the substantial major life activities of performing manual tasks, walking, standing, lifting, bending, and working.

60.     On or around September 13, 2018, Defendant ceased accommodating Plaintiff and required her to return to full duty status.

61.     Plaintiff opposed this full-duty status, as it required to her wear a gun belt and this heavy mechanism would exacerbate and increase her back and lumbar pain.

62.     Although Plaintiff's primary care physician submitted documentation informing Defendant that Plaintiff should not wear a utility belt due to the strain it causes her back and lumbar, Defendant disregarded Plaintiff's ongoing need for this accommodation.

63.     As a result of the denial of this accommodation and being forced to daily wear her utility belt, Plaintiff's back and lumbar pain greatly suffered, to the extent that her treating physician increased her pain medication dosage.

64.     Being forced to work in conditions that caused her significant pain caused Plaintiff significant stress, to the extent that she reported this to Defendant in early 2019.

65.     As a result of Plaintiff's pain and stress caused by Defendant's refusal to accommodate her, Defendant forced Plaintiff off work from approximately April 2019 to August 2019, wherein Plaintiff was not paid for this leave.

### Plaintiff Kristal Scott Facts

66.     Plaintiff was employed by the Detroit Police Department beginning in 2004.

67.     In 2013, Plaintiff suffered a torn meniscus, which the parties at the time disputed whether this was work or non-work related, her torn meniscus is applicable to this litigation only in that Plaintiff's subsequent physical limitations qualifies as a "disability" as will be discussed below.

68.     Due to the injuries Plaintiff suffered relating to her legs and lower back, Plaintiff requested and was granted a restricted-duty assignment at the DPD Gun Desk from approximately August 2012 until her forced retirement.

69.     The City of Detroit deemed Plaintiff's position at the gun desk an accommodation.

70.     While Plaintiff's leg injuries affected her ability to run and ambulate, it generally had no prohibiting effects of her ability to perform her duties at the Gun Desk.

71.     Plaintiff's knee injury impacted the substantial major life activities of performing manual tasks, walking, standing, lifting, bending, and working.

72.     After the City of Detroit recommended Plaintiff be forcibly retired, her retirement was approved on or around August 3, 2017 and became effective on September 7, 2017.

73.     Plaintiff subsequently appealed this decision, which was affirmed on March 1, 2018.

74.     In discriminatorily retiring Plaintiff, the City largely relied on the authority to do so because this was collectively bargained by Defendant DPOA.

75.     Specific to her claims, the impetus for the City's discriminatory conduct arose from Section 34(E) of the parties CBA, which states that, "[n]othing in this Article shall affect the right of the Department under the Charter of the City of Detroit to refer employees for duty or non-duty disability pensions."

## COUNT I
## VIOLATION OF 42 U.S.C § 12101, *et seq.*, OF THE AMERICANS WITH DISABILITIES ACT—DISCRIMINATION AND/OR FAILURE TO ACCOMMODATE
## AS TO DEFENDANT CITY OF DETROIT

76.     Plaintiffs[1] reasserts and re-alleges each and every allegation contained in paragraphs 1 through 89, as if fully set forth herein.

77.     Title I of the Americans with Disabilities Act, 42 U.S.C. § 12112, prohibits discrimination against any qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, or discharge of

---

[1] This Count is brought solely against the City of Detroit and is on behalf of Plaintiff Yarlen Henry, Wade Garbie and Dawn Wortham.

employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

78.    42 U.S.C. § 12111(8) defines qualified individual to mean an individual who with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires.

79.    At all relevant times, Plaintiffs, based on their above-referenced disabilities, are qualified individuals within the meaning of 42 U.S.C. § 12111(8).

80.    Plaintiffs could perform the jobs duties of the jobs they held at the time of their forced retirement with, or without, a reasonable accommodation.

81.    Specific to Plaintiff Wortham, she was accommodated for a period of time, only to have her accommodation refused for a period of months, to the extent that this failure to accommodate without reason caused her further injuries.

82.    42 U.S.C. § 12112(b) defines discrimination against a qualified individual on the basis of disability. The definition of discrimination includes the failure to reasonably accommodate a disabled individual. It includes the following:

  a.    42 U.S.C. § 12112(b)(3) includes in the definition of discrimination utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability.

  b.    42 U.S.C. § 12112(b)(5) includes in the definition of discrimination the failure to reasonably accommodate a qualified individual with a disability.

  c.    42 U.S.C. § 12112(b)(6) includes in the definition of discrimination the use of qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual

with a disability or a class of individuals with a disability unless it is shown to be job related for the position in question and consistent with business necessity.

83. A reasonable accommodation under the ADA includes "job restructuring…reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations[.]" 42 U.S.C. § 12111(9).

84. Likewise, an employer under the ADA has a duty to consider transferring a disabled employee who can no longer perform his/her old job even with accommodation to a new position within the company for which that employee is otherwise qualified.

85. The ADA also requires an individualized inquiry into each individual employee's specific situation and need for an accommodation and accommodating such a request unless the request poses an undue hardship.

86. To determine the reasonableness of an accommodation, the ADA's regulations dicate that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

87.     The purpose of this interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

88.     Defendant violated the ADA when it discriminated against Plaintiffs based on their disability and request for accommodation by failing to accommodate Plaintiff.

89.     Defendant's failure to accommodate Plaintiffs Garbie and Henry amounted to them being forcibly retired against their will.

90.     Defendant's failure to accommodate Plaintiff Wortham amounted to her suffering further injuries and exacerbated injuries that she sought an accommodation for; indeed, an accommodation was available given Defendant had accommodated her a long period before September of 2018.

91.     Defendant discriminated against Plaintiffs by enforcing its facially discriminatory policies regarding disabled employees and taking adverse employment actions against Plaintiffs lacking either a sufficient reason or engaging in any interactive process.

92.     By ignoring ongoing discrimination and enforcing discriminatory policies against Plaintiffs, Defendant disregarded Plaintiffs' basic rights under the Americans with Disabilities Act.

93.     Defendant's actions and policies in discriminating against Plaintiffs based on their disability and failing to accommodate Plaintiffs were conducted with malice or reckless indifference to Plaintiffs' federally protected rights.

94.     Given Defendant's general treatment of Plaintiffs' need for accommodation(s), Plaintiffs have direct evidence of discrimination.

95.     Instead of considering accommodating Plaintiffs by engaging in an interactive process to determine what job(s) Plaintiffs could perform, Defendant abruptly and baselessly retired Plaintiffs and/or denied Plaintiff Wortham an accommodation.

96.     As a direct and proximate result of Defendant's unlawful action, Plaintiffs have sustained injuries and damages, including, but not limited to: potential loss of earning capacity, loss of career and employment opportunities, loss of employee benefits, loss of promotional opportunities, humiliation and embarrassment, mental and emotional distress, and loss of everyday pleasures of everyday life.

97.     Pursuant to the ADA, Defendants are liable to Plaintiffs for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable are deemed insufficient to fully compensate Plaintiffs and/or to punish or deter Defendant, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies.

WHEREFORE, Plaintiffs Yarlen Henry, Wade Garbie and Dawn Wortham respectfully request that this Honorable Court enter judgment in their favor and against Defendant, for compensatory damages in whatever amount they are found to be entitled, exemplary damages commensurate with the wrong and Defendant's ability to pay, punitive damages, and an award of their fair and reasonable attorney fees, cost of litigation, and interest.

## COUNT II
## VIOLATION OF 42 U.S.C § 12101, *et seq.*, OF THE AMERICANS WITH DISABILITIES ACT—DISCRIMINATION AS TO DEFENDANT DPOA

98.     Plaintiff[2] reasserts and re-alleges each and every allegation contained in paragraphs 1 through 97, as if fully set forth herein.

99.     Title I of the Americans with Disabilities Act, 42 U.S.C. § 12112, prohibits discrimination from any "covered entity" against any qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

100.   The ADA goes on to state that the term "discriminate against a qualified individual on the basis of disability" includes "[p]articpating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's

---

[2] This Count is solely brought by Kristal Scott and is limited to Defendant DPOA.

qualified applicant or employee with a disability to the discrimination prohibited by this subchapter." 42 U.S.C. § 12112(b)(2).

101.   The ADA also prohibits covered entities (which includes labor organizations) from utilizing standards, criteria, or methods of administration that either "have the effect of discrimination on the basis of disability" or "that perpetuate the discrimination of others who are subject to common administrative control." 42 U.S.C. § 12112(b)(3)(a),(b).

102.   42 U.S.C. § 12111(8) defines qualified individual to mean an individual who with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires.

103.   At all relevant times, Plaintiff Scott, based on her above-referenced disabilities, was a qualified individual within the meaning of 42 U.S.C. § 12111(8).

104.   Plaintiff could perform the duties of the job she held at the time of her forced retirement with, or without, a reasonable accommodation.

105.   42 U.S.C. § 12112(b) defines discrimination against a qualified individual on the basis of disability. The definition of discrimination includes the failure to reasonably accommodate a disabled individual. It includes the following:

> a.   42 U.S.C. § 12112(b)(3) includes in the definition of discrimination utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability.

> b.   42 U.S.C. § 12112(b)(5) includes in the definition of discrimination the failure to reasonably accommodate a qualified individual with a disability.

c.   42 U.S.C. § 12112(b)(6) includes in the definition of discrimination the use of qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with a disability unless it is shown to be job related for the position in question and consistent with business necessity.

106.   A reasonable accommodation under the ADA includes "job restructuring…reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations[.]" 42 U.S.C. § 12111(9).

107.   Likewise, a covered entity under the ADA has a duty to consider transferring a disabled employee who can no longer perform his/her old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified.

108.   The ADA also requires an individualized inquiry into each individual employee's specific situation and need for an accommodation and accommodating such a request unless the request poses an undue hardship.

109.   To determine the reasonableness of an accommodation, the ADA's regulations indicate that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting

from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

110.   The purpose of this interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

111.   Defendant violated the ADA when it discriminated against Plaintiff based on her disability and request for accommodation by agreeing to and enforcing a collective bargaining agreement that permitted disability discrimination.

112.   Defendant discriminated against Plaintiff by enforcing its facially discriminatory CBA policy regarding disabled employees, which amounted to the City's ability to discriminatorily retire Plaintiff.

113.   By ignoring ongoing discrimination and perpetuating discriminatory policies against Plaintiff, Defendant disregarded Plaintiff's basic rights under the Americans with Disabilities Act.

114.   The Collective Bargaining Agreement negotiated by Defendant DPOA is facially discriminatory for numerous reasons, including but not limited to: it forecloses any obligations of the City of Detroit to comply with the ADA and it allows the City to forcibly retire employees such as Plaintiff irrespective of whether an accommodation is available and/or whether the City has engaged in an interactive process to make this determination.

115.   Because the City interprets the CBA literally as "nothing…shall affect the right of the Department…to refer employees for duty or non-duty disability pensions," this provision has assisted the City of Detroit in discriminatorily retiring various employees, including Plaintiff Kristal Scott.

116.   Defendant's actions and policies in discriminating against Plaintiff based on her disability was conducted with malice or reckless indifference to Plaintiff's federally protected rights.

117.   As a direct and proximate result of Defendant's unlawful action, Plaintiff has sustained injuries and damages, including, but not limited to: potential loss of earning capacity, loss of career and employment opportunities, loss of employee benefits, loss of promotional opportunities, humiliation and embarrassment, mental and emotional distress, and loss of everyday pleasures of everyday life.

118.   Pursuant to the ADA, Defendant is liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable are deemed insufficient to fully compensate Plaintiff and/or to punish or deter Defendant, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies.

WHEREFORE, Plaintiffs Kristal Scott respectfully requests that this Honorable Court enter judgment in their favor and against Defendant, for compensatory damages in whatever amount they are found to be entitled, exemplary

damages commensurate with the wrong and Defendant's ability to pay, punitive damages, and an award of their fair and reasonable attorney fees, cost of litigation, and interest. Plaintiff also seeks declaratory relief that the Collective Bargaining specific to the forced retirement of employees based on their disability and how the City has broadly interpreted and applied it violates the ADA.

Respectfully Submitted,

RASOR LAW FIRM, PLLC

/s/ Andrew J. Laurila
ANDREW J. LAURILA (P78880)
Attorney for Plaintiff
201 E. 4th Street
Royal Oak, MI 48067

Dated: November 30, 2021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


YARLEN HENRY,
WADE GARBIE,
DAWN WORTHAM,
and KRISTAL SCOTT,

      Plaintiffs,                              Civil Action No.:

v

CITY OF DETROIT, and
DETROIT POLICE OFFICERS
ASSOCIATION,

      Defendants.

_____

JAMES B. RASOR  (P 43476)
ANDREW J. LAURILA  (P 78880)
Rasor Law Firm, PLLC
Attorneys for Plaintiffs
201 E. Fourth Street
Royal Oak, MI  48067
248/543-9000 // 248/543-9050 fax
ajl@rasorlawfirm.com
_____

## **DEMAND FOR JURY TRIAL**

      **NOW COMES** Plaintiffs, by and through their attorneys, RASOR LAW FIRM,

and hereby requests trial by jury in the above-captioned matter.

Respectfully Submitted,

RASOR LAW FIRM, PLLC
/s/ Andrew J. Laurila
ANDREW J. LAURILA (P78880)
Attorney for Plaintiff
201 E. 4th Street
Dated: November 30, 2021          Royal Oak, MI 48067